600 So.2d 963 (1992)
Larry J. CLANTON & Sylvia Clanton
v.
Frances M. HATHORN.
No. 07-CA-59646.
Supreme Court of Mississippi.
May 27, 1992.
*964 James A. Becker, Jr., Watkins & Eager, Jackson, for appellant.
James Robert Gilfoy, IV, Lexington, for appellee.
Before HAWKINS, P.J., and PRATHER and ROBERTSON, JJ.
ROBERTSON, Justice, for the court:

I.
This rural real property dispute pits a landlady against her former tenant. In happier times, the landlady conveyed to the tenant several acres as a home site. The tenant proceeded to encroach modestly beyond his boundaries. The landlady sued to confirm and remove clouds, and the former tenant has claimed permissive use, laches, estoppel and most every other equitable defense one might imagine.
The Chancery Court saw the parties' common boundary line undisputed and found no reason why it should not be enforced. We agree.

II.
Frances M. Hathorn, age 58 at trial, lives in Memphis, Tennessee, and owns approximately 2300 acres of rural farm land in Holmes County, Mississippi. Apparently Hathorn's family has been in the area since at least 1869, and she maintains a second residence in nearby Tchula.
In 1975, Hathorn leased to Larry J. Clanton, a farmer, two tracts of land, the McCarty Place, with which we are concerned today, and a larger tract known as Pine Grove Place. Relations between landlady and tenant were quite cordial in the early years, and the evidence shows Clanton producing yields profitable to all.
The McCarty Place comprises some 125 acres or so. On March 27, 1978, Hathorn conveyed to Clanton a "most irregular shape[d]" 3.63 acre parcel with some 120 feet of front footage on Mississippi State Highway 12. A surveyor's drawing, oriented northward, reveals a shape not unlike the hull of an unimaginatively designed vessel, bathtub variety, with its bow point blunted, kissing Highway 12. All understood that Clanton, who had recently married, would build his home here.
The three bones of contention soon appeared. Clanton lay down a 500 foot driveway meandering from his home east northeasterly to Highway 12, and at a cost of some $8,000.00. Right before it enters the highway right-of-way, this driveway curves northward and follows an old roadbed across land Hathorn had kept. The encroachment is described as "about the size of a pickup truck."
The lands on the southern and southwestern sides of Clanton's property are very low, "not suitable for anything but what it was  that being a wet slough." As a part of his home construction, Clanton began digging a pond on this "back" portion of his land, using the dirt to build up the home site. The pond, when completed, served as a barrier protecting the home from snakes, insects and others unwelcome. This pond encroaches onto Hathorn land.
At an unidentified time, but apparently shortly thereafter, Clanton ran a four inch sewer pipe from his home in a northerly to northwesterly direction out to the drainage area near Highway 12, and again encroached upon Hathorn property. In addition, it appears Clanton built an equipment shed on the eastern edge of his property and from time to time parked his equipment over on Hathorn-retained lands.
No written permission was extended Clanton for any of these encroachments. Hathorn insists no permission of any sort was given. Clanton says he had permission  sometimes "verbal," sometimes "implied"  to dig the pond and use the dirt.
It is not clear when Hathorn first knew of the encroachments. We do know that in 1982, she sought the advice of counsel and had prepared a lease agreement concerning the McCarty Place and which provided
Lessee[s] [Clantons] and their heirs and assigns specifically waive any and all *965 legal and equitable claims of ownership to said leased premises, including ownership through adverse possession, and agrees not to institute any action, legal or equitable, for the purpose of claiming ownership to the parcel hereby leased.
Clanton and his wife signed this agreement on Christmas day, 1982.
In 1983, the Hathorn-Clanton relationship began to sour. Hathorn charges Clanton arbitrarily plowed up certain lands required by government agricultural regulations to be left fallow and that this placed Hathorn at risk of a severe penalty. At this time, Hathorn terminated Clanton's lease on the Pine Grove Place. Notwithstanding, Clanton's lease on the McCarty Place continued through 1987.
Soon after the Pine Grove brouhaha, Hathorn engaged the services of a surveyor who, with all deliberate speed, proceeded to survey, mark and plat the lines on all Hathorn lands. Matters came to a head when surveyor Charles H. James delivered a plat confirming the three encroachments: the pond, the driveway, and the sewer pipe. The encroachments in the aggregate appear to cover less than an eighth of an acre.
On September 30, 1987, Hathorn commenced this civil action by filing her complaint in the Chancery Court of Holmes County, Mississippi. She sought to confirm her title and to remove clouds arising from Clanton's various encroachments. The Chancery Court found the dispute "to be a conflict of a personal nature more than that of a legal question" and lamented that "this court case has caused friction that will last a lifetime." Nevertheless, the Court upheld Hathorn's claims, rejected Clanton's equitable defenses, and vindicated Hathorn's "right to possession of those areas of encroachment, to be effected by this Court at defendant's expense."
Clanton now appeals.

III.
In legal as well as surveying theory, a boundary enjoys exactness and may be so fixed. When theory translates into fact, right becomes entitlement to exclude, which is as great on the periphery as at the core. Each landowner is entitled to exclude all others from the square inch most near the edge, as from the home place or fertile fields near the center. And so the Chancery Court held, although in a sense the case appears much ado about not very much: the worthlessness of the slough where Clanton dredged dirt and built his pond, the small value of the pickup trucksized driveway encroachment, and the ground occupied by the four inch sewer line notwithstanding, these are property in which Hathorn has undisputed rights, reminding us:
Property, a creation of law, does not arise from value, although exchangeable,  a matter of fact.... Property depends upon exclusion by law of interference... .
International News Service v. Associated Press, 248 U.S. 215, 146, 39 S.Ct. 68, 75, 63 L.Ed. 211, 223 (1918) (Holmes, J., concurring).
Clanton does not deny Hathorn holds record title to the disputed lands, nor that her boundaries have been accurately surveyed and fixed on the ground. Nor does Clanton claim adverse possession, for the obvious reasons that this suit was brought within nine years after Clanton began his encroachments, not to mention that the Christmas, 1982, lease agreement bound him that he would never claim by adverse possession.
Clanton does claim the Chancery Court erred when it rejected his equitable defenses, principal of which are laches[1] and equitable estoppel.[2] The factual predicate of Clanton's appeal is the same on all points. He argues he made the improvements at some $16,000.00 expense and that Hathorn, *966 who was well aware of what he had done, did nothing for nine years, thus equity should stay her hand. Clanton sees great weight in his nine-year acquiescence claim.
The problem of laggardly landowners who ignore claims or encroachments over long periods of time has been addressed by the legislature. Miss. Code Ann. § 15-1-13 (1972) is our familiar ten-year adverse possession statute. That act would seem to occupy the field. This would certainly seem the premise of our cases that laches is not a defense to an action if the plaintiff proceeds within the period of the applicable statute of limitations. Hans v. Hans, 482 So.2d 1117, 1121 (Miss. 1986); Continental Oil Co. v. Walker, 238 Miss. 21, 34, 117 So.2d 333, 337-38 (1960); Griffith, Mississippi Chancery Practice, 344-45 (2d Ed. 1950). It is difficult to imagine a case where we would credit a laches defense on an adverse claim to real property on grounds other than those set forth in the statute and our cases reading same. Of course, it is not necessary that we address so sweeping a point, it being sufficient that today's is not such a case.
Assuming arguendo his theory has credence, laches imports unreasonable delay plus prejudice. Clanton ignores that he made his encroachments and put out his money back in 1978. Whatever may have been the case had Hathorn allowed Clanton to use this land for nine years and then invest $16,000.00 in improving it, the nine-year acquiescence theory packs no present punch.[3] To the contrary, Clanton has enjoyed the use of Hathorn's property for nine years without interference or rent.
Clanton makes quite a to-do of his claim that Hathorn knew or should have known of his encroachments from the outset and, in any event, before the 1982 lease. Again he ignores that he encroached from outset, that he incurred no more expenses thereafter, and said he would never claim by adverse possession. Clanton tries to wiggle around the 1982 lease. It strikes us perfectly reasonable that one such as Hathorn, having learned of the encroachments and realized they had been in place for four years  and having decided to play hard ball  should consult counsel and have prepared an agreement which lays to rest any possible running of the adverse possession clock.
Not only is delay less than limitations not unreasonable delay, we have no legally cognizable prejudice. The Court below held Hathorn's delay caused Clanton "no detriment." The evidence supports this holding, as Clanton spent his money on the encroachments back in 1978 and, insofar as the record reflects, spent not a penny thereafter. Clanton suggests no other form of prejudice, nor does he mention the nine years of beneficial use he has received.
Still, Clanton says Sojourner v. Sojourner, 247 Miss. 342, 156 So.2d 579 (1963), supports the view that laches can be applied even where limitations is not run, particularly where delay has caused hardship or expenditures by the other party. Again, the delay did not cause any expenditure. That was done at the outset. Clanton has identified no hardship other than his 1978 expenses and his enjoyment of the use of these modest bits of Hathorn's land for some nine years.
Clanton struggles mightily to bring his claim within equitable estoppel. At *967 best, Hathorn allowed Clanton to encroach for nine years, but she certainly did nothing that encouraged or enticed him to do so. Clanton, on this point, makes a curious argument that the 1982 lease is somehow a permission that he might continue his encroachments. He finds significance in the lease's failure to record an objection to the pond or the driveway. How he gets this reading from Clanton's caveat that he would not make a claim of adverse possession, which relates to the entire property being leased, escapes us. Even if it is a permission, it is a gratuitious permission. Notwithstanding, Clanton insists that having granted this permission  "tacit approval," he calls it  "Hathorn cannot change her mind." If this be so, of course, Hathorn's tacit approval is enlarged into a lease in perpetuity which, of course, would be nothing short of a fee simple conveyance. This is a bit much.
Looking solely to the roadway, Clanton claims it previously a public road which had never been abandoned, hence, Hathorn had no rights of exclusion. He cites McNeely v. Jacks, 526 So.2d 541 (Miss. 1988). Here again, Clanton's line of reasoning is hard to follow, because what he seems to be saying is that he appropriated to his own use a public roadway and has used it as his private driveway since 1978. The Chancery Court obviously doubted that the "old country roadway through the ... [Hathorn] land was ever a public roadway at all," but held, if it were, it existed at most under an easement from the county which had long since been abandoned. Any public right ceased and reverted to Hathorn's predecessors. See Mississippi State Highway Commission v. McClure, 536 So.2d 895 (Miss. 1988); Picayune Wood Products Co. v. Alexander Manufacturing Co., 86 So.2d 480, 483 (1956).
The sum and substance of the matter is that we find nothing in the proceedings below, the record before us, or the briefs of counsel suggesting any course other than that the judgment in the Chancery Court be affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] For the legal contours of laches in the present context, see Hans v. Hans, 482 So.2d 1117, 1120-21 (Miss. 1986); and Twin States Realty Co. v. Kilpatrick, 199 Miss. 545, 553, 26 So.2d 356, 358 (1946).
[2] Equitable estoppel is fleshed out in Hans, 482 So.2d at 1121-22; and PMZ Oil Co. v. Lucroy, 449 So.2d 201, 206 (Miss. 1984).
[3] This includes $8,000.00 for the 500-foot driveway, no more than twelve to fifteen feet of which appears to encroach on Hathorn's property. Several practical remedies seem obvious. Clanton could slightly re-route his driveway to the west, it being clear that the law affords him a right of access to Highway 12. Gilich v. Mississippi State Highway Commission, 574 So.2d 8, 12 (Miss. 1990); State Highway Commission of Mississippi v. McDonald's Corp., 509 So.2d 856, 861 (Miss. 1987). Mississippi State Highway Commission v. Null, 210 So.2d 661, 663 (Miss. 1968). Once the cost of such a re-routing is estimated, an even more sensible suggestion seems that Hathorn should sell and Clanton should buy this patch of earth for something between what it would cost Clanton to remove and rebuild his driveway and the income Hathorn might expect of it were it productive farm square footage. It seems unlikely rational wealth maximizers would ignore such a course. See Coase, The Problem of Social Costs, 3 J L. & Econ. 1 (1960), and progeny.